**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:24CR245** |
| | ) | **Hon. Rossie D. Alston, Jr.** |
| | ) | |
| **PETER MARKUS KUTTKE,** | ) | **Hearing Date: April 9, 2025** |
| **Defendant.** | ) | |

**DEFENDANT'S POSITION ON SENTENCING FACTORS**

COMES NOW, Peter Markus Kuttke, by and through counsel, and provides the Court with his position regarding the sentencing factors. Mr. Kuttke submits that for the reasons discussed below, an appropriate sentence requires no more than the mandatory minimum term of 60 months' imprisonment.

**BACKGROUND**

Mr. Kuttke turns 50 years old in July and has never been convicted of or arrested for a criminal offense. Tragically, ██████████████████████████ █████████████, months of loneliness and isolation, and a series of traumatic familial events led Mr. Kuttke to view child pornography, and thus, cause inarguable harm. Mr. Kuttke is unquestionably remorseful for his conduct. Immediately after law enforcement's initial search and interview of Mr. Kuttke in December 2023, during which he was fully cooperative, he began therapy to address the underlying motivations of his actions. And, despite his poor decision-making, he can again be a healthy member of society. Standing by ready to help him, Mr. Kuttke has the support of friends and family, even in light of his conviction.

1

Mr. Kuttke pleaded guilty to single count of receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2) and (b)(1). Based on Mr. Kuttke's Criminal History Category of I and the facts of this case, the parties agreed to an advisory guideline range of 97-121. The advisory guideline range contained in the PSR is 151-188 months of custody. The statute provides a mandatory minimum sentence of 5 years and a maximum sentence of 20 years of imprisonment. Mr. Kuttke is also facing a fine of up to $250,000, restitution payments, a special assessment, and at least 5 years of supervised release. After considering the sentencing factors enumerated in § 3553, there is no sentencing principle that would be served by any additional time beyond the statutory mandatory minimum term of imprisonment. Such a sentence is sufficient, but not greater than necessary to achieve the goals of sentencing, given Mr. Kuttke's background, including his lack of any criminal history, the fact that he has not had any improper contact with a minor or engaged in any other sexually dangerous behavior, and because the likelihood that he will re-offend is negligible. Such a sentence also is appropriate because the child pornography guideline has been widely criticized by courts and the Sentencing Commission alike, and is thus entitled to little deference. Consideration of the other sentencing factors, including sentences imposed in other recent child pornography cases, further support the imposition of a 60-month sentence.

## ARGUMENT

I.    **The Child Pornography Guideline and Resulting Guideline Range Are Entitled To Little Deference.**

### A.    The Sentencing Factors and Guidelines

The overriding principle and basic mandate of 18 U.S.C. § 3553(a) requires district courts to consider a number of factors in order to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing as set forth in the statute.[2]

The Guideline range, as one of many factors, is not binding. The Supreme Court has held that a defendant's Guideline range is truly advisory and that this Court is free to impose a sentence below the range. *See, e.g.*, *Gall v. United States*, 128 S. Ct. 586, 602 (2007) ("the Guidelines are only one of the factors to be considered when imposing sentence"); *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (noting that, after consideration of § 3553(a) factors and the "sufficient but not greater than necessary" requirement, a sentencing court may find that the case falls outside of the "heartland" contemplated by Guidelines, or that "the Guideline sentence itself

---

[2] These factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guidelines range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

fails properly to reflect § 3553(a) considerations," or that "the case warrants a different sentence regardless").

As the Supreme Court has observed, a guideline's strength depends on whether the Commission has acted in "the exercise of its characteristic institutional role." *Kimbrough v. United States*, 552 U.S. 85, 89 (2007). This role has two basic components: (1) reliance on empirical evidence of pre-Guidelines sentencing practice;[3] and (2) review and revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field. *Rita*, 551 U.S. at 349-350. In that institutional role, the Commission "has the capacity courts lack 'to base its determination on empirical data and national experience guided by a professional staff with appropriate expertise.'" *Kimbrough*, 552 U.S. at 109 (citation omitted).

Specifically, the Supreme Court has recognized that where the Commission fails to fulfill its role by premising a guideline on considerations other than empirical evidence and the § 3553(a) factors, the sentencing court may be inclined to reject the Guidelines. Thus, in *Kimbrough,* the Supreme Court held that sentencing judges

---

[3] In the Commission's initial development of the Guidelines, it took "an empirical approach that used as a starting point data estimating pre-guidelines sentencing practice." United States Sentencing Commission, *Guidelines Manual*, Ch. 1, Part A, § 1.3 (Nov. 2015). The Commission "analyzed data drawn from 10,000 presentence investigations, the differing elements of various crimes as distinguished in substantive criminal statutes, the United States Parole Commission's guidelines and statistics, and data from other relevant sources in order to determine which distinctions were important in pre-guidelines practice." *Id.* This empirical approach has helped the Commission "resolve practical problems by defining a list of relevant distinctions" among cases, and those "relevant distinctions not reflected in the guidelines probably will occur rarely and sentencing courts may take such unusual cases into account by departing from the guidelines." *Id.*

may disregard the Guidelines' sentencing recommendations for crack cocaine offenses based on their disagreement with the crack/cocaine sentencing disparity contained in the Guidelines.  552 U.S. 85, 91 (2007).  The decision was motivated by the Commission's failure to utilize empirical evidence in enacting the crack cocaine sentencing guidelines.  *See Kimbrough*, 552 U.S. at 109-10 (holding that where Guidelines are not the product of "empirical data and national experience," it is not an abuse of discretion for a sentencing court to conclude that the recommended sentence fails to achieve the purposes of sentencing set forth in Section 3553(a), even in "a mine-run case"); *see also Gall*, 552 U.S. at 46 n.2 ("Notably, not all of the Guidelines are tied to this empirical evidence.") (citing *Kimbrough*, 552 U.S. 85).

### B.    The Child Pornography Guideline Does Not Reflect Empirical Considerations or the Institutional Role of the Sentencing Commission.

As this Court well knows, the current child pornography guideline, U.S.S.G. § 2G2.2, has been strongly criticized, including by the Sentencing Commission itself, because of its lack of empirical basis and failure to distinguish among offenders in terms of culpability and dangerousness.  Like the crack-cocaine guideline, the child pornography guideline was not born of sound research or empirical study but instead formulated primarily of Congressional mandates.  *See generally* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the*

*Child Pornography Guidelines* (January 1, 2009) (hereinafter "Deconstructing the Myth").[4]

As set forth below, the Guideline ranges for child exploitation offenses increased sharply over a period of ten-plus years in response to a series of statutory directives. *See* U.S.S.G. App. C, Amends. 537 and 538 (Nov. 1, 1996), 592 (Nov. 1, 2000), 615 (Nov. 1, 2001), 651 (Oct. 27, 2003), and 664 (Nov. 1, 2004). From 1987 through 1990, the initial base level under § 2G2.2 remained at level 13 for offenses involving transporting, receiving, or trafficking in child pornography. Simple possession of child pornography was not yet a crime. *See* Deconstructing the Myth at 4. In 1990, Congress criminalized the possession of child pornography, raised maximum possible penalties, and introduced mandatory minimum sentences for repeat offenders. *See* Pub. L. 101-647, Title III, § 323(a), (b), Nov. 29, 1990, 104 Stat. 4818-19. The resulting guideline assigned a base offense level of 10 to the offense of possession of child pornography. *See* Deconstructing the Myth at 5-6.

Then, from 1991 to 2003, Congress enacted a series of amendments to the Guidelines that drastically increased the ranges and led to a more than 400% increase in the mean sentences for child pornography offenders. As detailed in greater length in the Stabenow Report, the most draconian changes to the guideline occurred as a result of the PROTECT ACT of 2003, which was enacted as the rate of downward

---

[4] Available at
https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/deconstructing_the_guidelines/child-porn-july-revision.pdf (last accessed April 2, 2025).

departures in child pornography cases increased. *See* U.S. Sentencing Comm'n, Report to Congress: Child Pornography Offenses (December 2012) at 123 ("U.S.S.C. 2012 Report").[5]  In that Act, Congress, in an unusual move, directly amended the Guidelines by drafting guideline text. *See* Deconstructing The Myth at 22. "In the past, Congress often . . . issue[d] directions to and requests for study from the Commission, but left it to the Commission to craft specific Guideline text. This time, Congress completely ignored the expert role the Sentencing Commission was designed to play, cut the Commission out of the process entirely, and directly wrote Guideline text to its own specifications." Steven L. Chanenson, *Hoist with Their Own Petard?*, 17 Fed. Sent'g Rep. 20, 23 & nn. 54-57 (2004).  Furthermore, "Congress acted . . . without giving either the Judicial Conference or the Sentencing Commission a fair opportunity to consider and comment on the direct amendment." Deconstructing The Myth at 22.

The legislation directly mandated new enhancements such as an enhancement of up to 5 levels based on the number of images involved, and a 4-level enhancement for sadistic or masochistic images for possession offenders. *See id*. at 20-24.  In the wake of these statutory mandates and empirically unsupported amendments, the mean sentences in child pornography cases increased dramatically, from just 20.59

---

[5] *Available at* https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf (last accessed April 2, 2025).

months of confinement in 1997, to 91.3 months in 2007, an increase of 443%.  *See id.* at 2.

On December 30, 2003, and January 14, 2004, the Commission published for notice and comment its own proposed amendments to revise the child pornography guideline.  *See id.* (citing 69 Fed. Reg. 2, 169 (Jan. 14, 2004) (Notice of Proposed Amendments to Sentencing Guidelines, Policy Statements, And Commentary); 68 Fed. Reg. 75, 340 (Dec. 30, 2003)).  In an attempt to reconcile the provisions of the PROTECT Act, the Commission eventually adopted an amendment raising the base offense levels – for possession from 15 to 18, and for trafficking, receipt, and distribution related offenses from 17 to 22.  *See* U.S.S.G. App. C, Amendment 664. The Commission's reason for re-structuring the offense characteristics of § 2G2.2 was solely to ensure that the Guidelines range matched or exceeded the newly increased mandatory minimums and rules put forth in the PROTECT Act, rather than to serve the statutory purposes of sentencing overall.  *See* Amendment 664 ("The PROTECT Act established five year mandatory minimum terms . . . as a result of these new mandatory minimum penalties . . . the Commission increased the base offense level for these offenses. . .").

As the arbitrary nature of the child pornography guideline has become more and more apparent, the judicial and legal communities have approached a consensus that the § 2G2.2 guideline is broken.  Numerous courts have criticized the guideline in its current form, and many courts (including Courts of Appeal in the First, Second, Third, Sixth, Seventh and Ninth Circuits) have endorsed the notion that a district

court may follow *Kimbrough* and properly find that the child pornography guideline does not exemplify the Commission's characteristic institutional role of basing its determinations on empirical data and national experience.[6]

Indeed, Senior United States District Judge Jack Weinstein imposed a non-custodial sentence of seven years of supervised release in a possession of child pornography case where the Guidelines range was 78 to 97 months. *United States v. R.V.*, 2016 WL 270257 (E.D.N.Y. Jan. 21, 2016). In that case, the defendant downloaded child pornography using peer-to-peer file-sharing software and (unlike Mr. Kuttke) engaged in video chats with minor females while posing as a teenage boy. In his lengthy opinion, Judge Weinstein wrote that "numerous courts . . . have recognized that the current child pornography Guidelines do not adequately reflect the impact of the changing technological landscape on an individual's level of

---

[6] *See United States v. Stone*, 575 F.3d 83, 89-90 (1st Cir. 2009) ("[O]ur precedent has interpreted *Kimbrough* as supplying this power even where a guideline provision is a direct reflection of a congressional directive," including the career offender and child pornography guidelines); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (*Kimbrough's* holding that "it was not an abuse of discretion" for a district court to disagree with the crack guidelines "because those particular Guidelines 'do not exemplify the Commission's exercise of its characteristic institutional role'... applies with full force to § 2G2.2"); *United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) ("the Commission did not do what 'an exercise of its characteristic institutional role' required – develop § 2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress"); *United States v. McNerney*, 636 F.3d 772, 775-76 (6th Cir. 2011) (finding that § 2G2.2 was "fundamentally different" from most other Guidelines because the Commission "did not use [an] empirical approach in formulating the Guidelines for child pornography"); *United States v. Halliday*, 672 F.3d 462, 474 (7th Cir. 2012) (district courts are "at liberty to reject *any* Guideline on policy grounds," and district court has direction to disagree with the child pornography guidelines); *United States v. Henderson*, 649 F.3d 955, 959-60 (9th Cir. 2011) ("[T]he child pornography Guidelines were not developed in a manner 'exemplify[ing] the Commission's exercise of its characteristic institutional role'").

culpability," *id.* at *38, and that "disagreement with the current sentencing scheme has convinced an increasing numbering of judges to impose sentences below those recommended by the Guidelines in non-production cases." *Id.* at *42; *see also id.* at *43 (citing cases).

Because of the widespread criticism, the Sentencing Commission undertook a review of the child pornography guideline. In December 2012, the Commission issued a report to Congress regarding its review of child pornography sentencing practices. Notably, this report requested a complete overhaul of the child pornography guideline. *See* note 7 *supra*, U.S.S.C. 2012 Report at 321 ("the current sentencing scheme results in overly severe guideline ranges for some offenders based on outdated and disproportionate enhancements …."). That report also noted the trend of courts imposing below-Guidelines sentences in child pornography cases: "The rate of non-production cases in which sentences were imposed within the applicable guideline range steadily fell from its high point in fiscal year 2004, at 83.2 percent of cases, to 40.0 percent of cases in fiscal year 2010, and to 32.7 percent of cases in fiscal year 2011." *See United States v. R.V.*, 2016 WL 270257 at *43 (quoting the 2012 Report).

Finding that "the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based upon their degrees of culpability," the Commission stated its view of the guideline in no uncertain terms:

> [T]he current non-production guideline warrants revision in view of its outdated and disproportionate enhancements related to offenders' collecting behavior as well as its failure to account fully for some offenders' involvement in child pornography communities and sexually dangerous behavior. The current guideline produces overly severe sentencing ranges for some offenders,

unduly lenient ranges for other offenders, and widespread inconsistent application.    A revised guideline…would better promote proportionate sentences and reflect the statutory purposes of sentencing.

U.S.S.C. 2012 Report, at *ii* (Executive Summary).

### C.    The Guideline Enhancements Result in Sentences Disproportionate to Culpability.

As recognized by the Sentencing Commission, apart from Congress's atypical involvement in its formulation, the deep flaw in the child pornography guideline is that it fails to distinguish among defendants in any meaningful way, instead drastically increasing the sentencing range for *all* offenders.    Significant technological changes over the last few decades have changed the offense conduct of the average offender, and "enhancements that were intended to apply only to certain offenders who committed aggravated child pornography offenses are now being applied routinely to most offenders."  U.S.S.C. 2012 Report at 313.

Indeed, four out of the six possible upward enhancements under § 2G2.2  – all four of which the PSR applied to Mr. Kuttke and together account for 13 of his offense levels – "now apply to the typical non-production offender": § 2G2.2(b)(2) -- depiction of prepubescent minors (96%); § 2G2.2(b)(4) -- sexually explicit (sado-masochistic) images (74%); 2G2.2(b)(6) -- use of a computer (96%); and § 2G2.2(b)(7) -- 600 or more images (69%).  U.S.S.C. 2012 Report at 316.  The four enhancements that apply in these majority of cases, including here, increase Mr. Kuttke's offense level by 13

levels, and lead to a highly inflated range of 151 to 188 months in the PSR.[7]  *See U.S. v. Dorvee*, 616 F.3d at 186-187 (finding that a "first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction"). Without those enhancements, Mr. Kuttke's Guidelines range would be 37-46 months.

Given the "irrationality" of the child pornography guideline, Mr. Kuttke's Guidelines range should not be considered a valid measure of his culpability or what the appropriate sentence should be in this case.   Instead, the sentencing determination in this case should be based on the remaining § 3553(a) factors and that statute's mandate that the Court impose the least amount of incarceration necessary to achieve the goals of sentencing.   As set forth below, given Mr. Kuttke's personal history and post-offense behavior, and the sentences imposed by this Court in other child pornography cases, a sentence of 60 months is appropriate.

## II.    Application of Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)

### A.    Mr. Kuttke's Personal History & Characteristics and the Nature of his Offense Support a Sentence of 60 Months.

Markus Kuttke, age 50, was born in 1975 in Dresden, East Germany. *See* PSR 59. The first fifteen years of Mr. Kuttke's life coincided with the final years of the Cold War, when his hometown of Dresden was characterized by economic precarity,

---

[7] Counsel recognizes that the parties have agreed not to seek one of the enhancements discussed above. Nevertheless, the application of the remaining enhancement still inflate Mr. Kuttke's range to 97-121.

major post-war reconstruction, and Soviet military presence.[8] Then, the Berlin Wall fell in 1989, ushering in German reunification and Soviet withdrawal.[9]

The Berlin Wall is often portrayed as a dam that, when broken, flooded East Berlin—and the Eastern Bloc more broadly speaking—with new ideas and opportunities. Mr. Kuttke witnessed this powerful phenomenon firsthand in Dresden, specifically encountering Mormon missionaries in 1990 whose religious activities had been heavily restricted in the Eastern Bloc throughout the Cold War. *See* PSR 64.

Indeed, in those pivotal years, an official publication of the Mormon Church had the following to say about reentering Dresden: "Historic buildings are being restored. And the Church has built a new meetinghouse. Once again missionaries, 140 strong, are teaching the gospel to the people of this once-again beautiful city."[10] In the early nineties, enthusiastic and persistent missionaries invited Mr. Kuttke to join their tight-knit, stable, and family-oriented congregation. *See* PSR 64. Today, Mr. Kuttke describes their outreach at the time as feeling like no less than an opportunity to begin a completely different kind of life.

It is not surprising that Mr. Kuttke sought a fresh start. While he enjoyed close and enriching relationships with his mother Ingrid, his half-brother Friedbert and

---

[8] *East Germany*, WILSON CTR. DIGIT. ARCHIVE, https://digitalarchive.wilsoncenter.org/places/east-germany (last visited Mar. 29, 2025).
[9] *Id.*
[10] *Dresden Rich in LDS History*, CHURCH NEWS, https://www.thechurchnews.com/1990/12/29/23261040/dresden-rich-in-lds-history/ (last visited Mar. 29, 2025).

his grandparents, *see* Letter of Rolf Friedbert Köthe, attached hereto as Attachment A at 2, Mr. Kuttke had been neglected by his father and stepfather and █████████ ████████████████████████████████████. *See* PSR 60-63. The life that the Mormon missionaries described offered him potential comfort in a personally and politically tumultuous time.

Mr. Kuttke's biological parents divorced in 1979 when he was four years old. His father both failed to contribute child support and only bothered to visit Mr. Kuttke two or three times per year, despite their close geographic proximity. *See* PSR 60. In 1984 when Mr. Kuttke was nine years old, his mother Ingrid married Mr. Rolf Köthe, an abrasive man who came to despise Mr. Kuttke, chastising him often simply for being a child. *See* Letter of Rolf Friedbert Köthe, attached hereto as Attachment A at 2.

Mr. Kuttke's mother's marriage to his stepfather was short-lived, ending during Mr. Kuttke's early teens. *See* PSR 60. His stepfather blamed the couple's divorce on issues allegedly caused by Mr. Kuttke, *see id.*, but Mr. Kuttke's half-brother and mother remember Mr. Kuttke in a different light. Mr. Kuttke's half-brother emphasizes how Mr. Kuttke was a "mentor" and "pillar," *see* Letter of Rolf Friedbert Köthe, attached hereto as Attachment A at 2, and his mother proudly recalls Mr. Kuttke's primary school teachers telling her about how "he always offered his help to the weaker children" and was "a great advocate for justice," *see* Letter of Ingrid Köthe, attached hereto as Attachment A at 1.

 Recreational time
that he had previously spent exploring the outdoors and his neighborhood was
redirected toward activities at the newly constructed Dresden Mormon
meetinghouse, where he felt belonging and care. *See* PSR 64. Then, when he was 17,
he met a girl at school—Ulrike Henkel-Conley (formerly Henkel-Kuttke) —who was
even more involved with the meetinghouse than he was. The two fell in love, and both
Mrs. Henkel-Conley and the missionaries pressured Mr. Kuttke to get married. *Id*.

Mr. Kuttke was baptized into the Mormon church in 1994, marrying Mrs.
Henkel-Conley and moving away from home with her in 1996 at age 20 to attend
university and then graduate school. *See* Hunt Report, attached hereto as
Attachment B at 6. The two share five biological children and one foster child—

Christian (27), Konrad (23), Eva (21), H███ (16), J███ (15), and F███ (15) Kuttke—all of whom were born while the couple lived in Germany. *See Id.*



*Spring 2016: The Kuttke family in their first neighborhood in the U.S.*

Several of the children are neurodivergent and/or suffer from mental illness, requiring particular attention and care. For example, F███ has suffered from a neurological disorder that confines him to a wheelchair for his entire life, *see* PSR 65, and in 2023 H██ showed severe signs of self-harm and depression and she was hospitalized.  Supporting a family of eight was always a significant challenge. Despite being stretched thin financially, Mr. Kuttke was able to create magical memories for his children by meticulously planning and saving for family camping and road trips. *See* Letter of Eva Kuttke, attached hereto as Attachment A at 5 & Letter of Konrad Kuttke, attached hereto as Attachment A at 4.



*Summer 2020: Four of the Kuttke children in front of an RV that Mr. Kuttke rented*

In 2014, Mr. Kuttke was offered an IT role with the German military's United States outpost in northern Virginia. *See* PSR 67. The move to the U.S. was exciting for the family: there was a strong Mormon community to join, a fantastic Washington, D.C. German international school for the children to attend, and several proximate national and state parks to enjoy together. They embraced the opportunities the U.S. presented to them. Mr. Kuttke dedicated himself to his new job; a colleague, Mr. Marko Westphal, describes Mr. Kuttke as a tireless worker with exceptional commitment to his professional responsibilities. *See* Letter of Marko Westphal, attached hereto as Attachment A at 6. For their part, the children settled into school and Mrs. Henkel-Conley joined the choir at the Washington, D.C. Mormon Temple.

Ironically, when Mr. Kuttke moved to the country where Mormonism originated, he began to seriously question both his faith and the motives of church leaders. However, as Mr. Kuttke began to distance himself from a church that he

increasingly viewed as cult-like, his wife drew closer. Their relationship suffered for it, and they stopped being intimate with one another. Mr. Kuttke soon learned why Mrs. Henkel-Conley had all but withdrawn from their relationship, spending so much time with her church friends; she was cheating on him with another member of the Mormon women's choir she had joined. After Mr. Kuttke discovered his wife's infidelity, the two divorced in 2018. *See* Hunt Report, Attachment B at 6.

After the divorce, Mrs. Henkel-Conley moved back to Germany with her now wife and most of the couple's children. However, his son Konrad and daughter Eva stayed with Mr. Kuttke in the U.S. to complete high school. *See* Hunt Report, Attachment B at 6. Upon returning to Germany, Mrs. Henkel-Conley began aggressively seeking alimony, even though she was the one who had violated the marriage pact. By this time, Mr. Kuttke had left the Mormon church, finding solidarity on TikTok with other ex-Mormons whose content his daughter Eva had shared with him.

In 2021, Konrad left for college in Germany; Mr. Kuttke and Eva were the only members of the family left in the U.S. *See* Hunt Report, Attachment B at 6. To make matters worse, they no longer had a church community to rely upon. Then, in 2023, Mr. Kuttke got a call from the German government that would end up being the straw that broke the camel's back. The father back in Germany who had essentially abandoned Mr. Kuttke as a child had died in his apartment and was left alone to rot for several weeks before the police discovered him. The law required Mr. Kuttke to

return to Germany immediately to clean his estranged father's apartment and manage his affairs.

When he returned to the U.S., Mr. Kuttke was haunted by the experience and was terrified of dying alone and unnoticed, just as his father had. These concerns about isolation were exacerbated by the fact that Mr. Kuttke's last remaining family member in the U.S., Eva, left for college in Germany in fall 2023. *See* Hunt Report, Attachment B at 6. Mr. Kuttke's freefall into profound loneliness led him to make decisions inconsistent with the good character he had consistently shown in all other areas of life. Mr. Kuttke had always loved to tinker with computers, and in summer 2023, he tried to escape from his malaise with complex technological projects that he never had the free time for before.

This is the part of the story where Mr. Kuttke made the series of bad decisions that he profoundly regrets and accepts complete responsibility for. When browsing the open internet one day on the computer he used for his projects (his "test" computer), Mr. Kuttke came across a website that looked like the now defunct webpages from the early 2000s that could be used to download pirated movies and music. Curious about the contents of the anachronistic site, Mr. Kuttke downloaded some files that it hosted, unaware at the time that those files included CSAM.

Weeks later, curiosity got the better of Mr. Kuttke again; he returned to the site using his test computer and made additional downloads which he came to realize included CSAM. To this day, Mr. Kuttke is at a loss for why he saved—and in some

cases, viewed—files which depict what he knows is reprehensible abuse. Sexual attraction to minors has never been a defining part of his sexuality, personality or identity.

In December 2023, when law enforcement came to search Mr. Kuttke's home for the test computer, he made no excuses for his behavior and was immediately cooperative. *See* PSR 22. Mr. Kuttke's initial representations to law enforcement align with observations about Mr. Kuttke made by mental healthcare professionals during treatment in the months following his arrest: "when discussing the impacts of CSAM, Mr. Kuttke did not justify or make excuses about the damage the material can cause. Similarly, he expressed no condonement of child sexual exploitation or abuse in general." *See* Hunt Report, Attachment B at 4.

However, Mr. Kuttke knows that the fact that he saved and viewed CSAM out of morbid curiosity and never intended to physically harm children is cold comfort to the victims whose darkest moments exist in perpetuity on the internet. He has read the accounts of the CSA survivors in the PSR and others elsewhere and listened to them via social media and in person. Mr. Kuttke's mental healthcare professionals confirm that "Mr. Kuttke has accepted responsibility for the behavior that brought him into services and has been appropriately remorseful for his actions." *See* Hunt Report, Attachment B at 7.

However, actions speak much louder than words. Mr. Kuttke's actions post-arrest align with the regret and compassion that he has expressed verbally. Mr.

Kuttke's mental healthcare professionals describe how he "attends sessions as scheduled and is receptive to feedback, in both individual and group modalities" as well as "has completed numerous treatment objectives to help him develop a deeper understanding of the factors that contributed to his referral conduct and has shown marked improvement in his insight and ability to discuss relevant topics." *See* Hunt Report, Attachment B at 7.

Mr. Kuttke's commitment to attending and engaging deeply with treatment has allowed his mental healthcare professionals to confidently assess that "there have been no indications that Mr. Kuttke's offending behavior was driven by a sexual disorder such as pedophilia," *see* Hunt Report, Attachment B at 7, and that "his overall risk appears to be in the below average range," *see* Hunt Report, Attachment B at 8. These assessments lead Mr. Kuttke's mental healthcare professionals to conclude that he "is a good candidate for community containment as he is amenable to outpatient treatment and compliant with supervision requirements." *See* Hunt Report, Attachment B at 9.

Mr. Kuttke's friends and family share his mental healthcare professionals' optimism about Mr. Kuttke's potential for constructive reintegration into the community. Mr. Kuttke's eldest son Christian, who is traveling from Germany to support him at his sentencing hearing, expresses the following: "my opinion of Markus does not change in the face of his offense. I know he is capable of change, compassionate, trustworthy and loyal." *See* Letter of Christian Kuttke, attached

hereto as Attachment A at 3. Furthermore, his former supervisor Alexander Konetzki asserts that "…he was always welcome in our house – my wife and our three children always liked his presence. We were even not scared as we learned about his crime." *See* Letter of Alexander Konetzki, attached hereto as Attachment A at 7.

### B.    The Need To Avoid Unwarranted Sentencing Disparities

A review of prior sentences imposed in this District and elsewhere establishes that any sentence in this case greater than the mandatory minimum would create an unwarranted sentencing disparity when considered in the context of similar offenses committed by offenders with no criminal history.  By way of specific example, relatively recently, Judge Brinkema sentenced Evan Thomas Rosser (No. 1:23-cr-103) to a term of 60 months for *distribution* of child pornography, as well as a fully concurrent sentence for possession of an unregistered silencer, despite a Guideline range of 135-168 months.  The Court's sentence in *Rosser* was not an outlier.  Rather, as the examples below illustrate, it is essentially the norm in cases like this, where there are no aggravating facts beyond viewing and downloading images:

| Defendant | Case No. | Charge | Disposition/ Guidelines | Sentence |
|---|---|---|---|---|
| **ALAHADI, Ammar Atef** | 1:18-cr-349 (LO) | Receipt of Child Pornography | Guilty Plea; Guidelines: 97-121 months | 60 Months |
| **ARNOLD, Patrick** | 1:12-cr-406 (LMB) | Receipt of Child Pornography | Guilty Plea; Guidelines: 151 to 188 Months | 60 Months |

| Defendant | Case No. | Charge | Disposition/ Guidelines | Sentence |
|---|---|---|---|---|
| **CAMBRELEN, Giancarlo** | 1:18-cr-342 (LMB) | Receipt of Child Pornography | Guilty Plea; Guidelines: 121-151 Months | 60 Months |
| **CRAFT, Christopher** | 1:16-cr-47 (TSE) | Receipt of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 months |
| **CRAWFORD, Stephen Thomas** | 1:17-cr-32 (CMH) | Receipt and Possession of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 Months |
| **CROSBY, William David** | 1:12-cr-442 (GBL) | Receipt of Child Pornography | Guilty Plea; Guidelines: 121-151 Months | 60 Months |
| **DE HARO, Louis Lope** | 1:08-cr-314 (LO) | Receipt of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 Months |
| **DODGE, Adam** | 1:17-cr-39 (CMH) | Receipt of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 Months |
| **FREER, Robert Kee, Jr.** | 1:19-cr-075 (LO) | Receipt of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 Months |
| **Hajbeh, Majed Talat** | 1:21-cr-83 (TSE) | Receipt and Transportation of Child Pornography | Found guilty at jury trial; Guidelines: 210-262 Months | 60 Months |

| Defendant | Case No. | Charge | Disposition/ Guidelines | Sentence |
|---|---|---|---|---|
| **Imparata, Drew** | 1:19-cr-173 (LMB) | Distribution of Child Pornography and Travel with Intent to Engage in Illicit Sexual Conduct | Guilty Plea; Guidelines: 600 Months (per Government Position on Sentencing) | 60 Months |
| **JANSSEN, Christopher** | 1:14-cr-139 (TSE) | Receipt of Child Pornography | Guilty plea; Guidelines: 151-188 Months | 60 Months |
| **LIN, Gabriel** | 1:17-cr-278 (LO) | Receipt of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 Months |
| **MCCLELLAN, John** | 1:15-cr-182 (GBL) | Receipt of Child Pornography | Guilty Plea; Guidelines: 121-151 Months | 60 Months |
| **MCCLESKEY, Michael** | 1:11-CR-0483 (AJT) | Receipt of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 Months |
| **Myers, Joshua** | 1:11-cr-327 (CMH) | Receipt of Child Pornography | Guilty Plea; Guidelines: 151-188 Months | 60 Months |
| **PORTILLO, Axel Ignacio** | 1:17-cr-97 (TSE) | Receipt of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 Months |
| **Rivas, Jonhy Ernesto Rodriguez** | 1:18-cr-252 (LMB) | Receipt of Child Pornography | Guilty Plea; Guidelines: 63-78 months | 60 Months |

| Defendant | Case No. | Charge | Disposition/ Guidelines | Sentence |
|---|---|---|---|---|
| Rodriguez, Santos Enrique | 1:21-cr-292 (LO) | Receipt of Child Pornography | Guilty Plea; Guidelines: 121-151 Months | 60 Months |
| SELLERS, Darrick Matthew | 1:17-cr-047 (LO) | Receipt of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 Months |
| SHAH, Milap | 1:14-cr-282 (AJT) | Receipt of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 Months |
| SIMS, Jason Mark | 1:17-cr-191 (TSE) | Distribution of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 Months |
| SIPULT, Kerry | 1:18-cr-328 (CMH) | Receipt of Child Pornography | Guilty plea; Guidelines: 97-121 Months | 60 Months |
| Thornton, Seth Aaron | 1:16-cr-246 (CMH) | Receipt of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 Months |
| TORRES, Angel | 1:24-cr-00054 (PTG) | Receipt of Child Pornography and | Guilty Plea; Guidelines: 97-121 Months | 60 months |
| Trujillo, Jeremiah | 1:13-cr-479 (TSE) | Distribution of Child Pornography | Guilty Plea; Guidelines: 63-78 Months | 60 Months |
| Visconi, Mark | 1:19-cr-258 (TSE) | Receipt of Child Pornography | Guilty Plea; Guidelines: 97-121 Months | 60 Months |

While the above cases do not represent the entire universe of child-pornography offenders sentenced in this Court, the sentences imposed in these cases

support a sentence no greater than the mandatory-minimum sentence of 60 months for Mr. Kuttke, who has no criminal history and whose offense was limited to viewing and downloading images.

Indeed, but for the mandatory-minimum sentence that governs this case due to the government's charging decision, there are many comparison cases in this District that would support a sentence far below 60 months in this case. In *United States v. Boccardo*, 1:17-cr-121 (GBL), for example, the defendant admitted to spending hours per day accessing and viewing images of child pornography including prepubescent minors and was sentenced to two years' probation. *See also United States v. Simpson*, 1:08-cr-0267 (E.D. Va. 2008) (LMB) (imposing sentence of 5 years' probation upon 65-year-old defendant with health problems who pleaded guilty to possession of child pornography; *United States v. Walker,* 2:17-cr-99 (E.D. Va. 2018) (AWA) (imposing sentence of 5 years' probation with 3 years of home confinement where the defendant possessed 4200 images and 515 videos of child pornography); *United States v. Teagno*, 1:09-cr-0328 (E.D. Va. 2009) (GBL) (imposing sentence of probation with 6 months' home confinement for possession of child pornography where offense involved distribution via peer-to-peer network); *United States v. Roberts*, 4:16-cr-63 (E.D. Va. 2017) (AWA) (imposing sentence of time-served—12 days—followed by one year of home confinement for accessing with intent to view child pornography over a period of two years); *United States v. Holmstedt*, No. 2:21-cr-4 (E.D. Va. 2021) (JAG) (imposing sentence of 12 months and 1 day, in case with

Guideline range of 78-97 months, where defendant pleaded to possession and offense conduct included downloading thousands of images from the dark web).

### D.    The Need To Protect the Public, Promote Respect for the Law, and Provide Just Punishment and Deterrence

A sentence of 60 months is an incredibly severe sentence, particularly for someone like Mr. Kuttke.  Mr. Kuttke has never been in any type of criminal trouble before, let alone prison.  Now he is a convicted felon, will spend *years* in prison, and be required to register as a sex offender in the United States.  He has lost his job, he has probably lost his retirement account, his separation from his family has been extended, and he will be removed from this country – likely without recourse to return in the future should he wish to do so.  These are all consequences Mr. Kuttke now has as a result of his offense.  They are severe and make 60 months incarceration more than sufficient to protect the public, promote respect for the law, and provide just punishment and deterrence.  However, as the character letters to the Court demonstrate, Mr. Kuttke has strong, supportive family and friends, who have remained by him through this process and will continue to assist him however they can.  Mr. Kuttke's return to his friends and family, particularly those in Germany, will aid Mr. Kuttke's return back into society as a productive member.

There is no question that viewing and receiving child pornography is a serious offense and harmful to the victims, and Mr. Kuttke has expressed heartfelt remorse for his conduct.  As the Court will hear, Mr. Kuttke has given much thought to his crime and realizes the extent to which he was hurting all of the

victims by viewing child pornography.  His has made a genuine effort to identify

what caused him to make such poor decisions to ensure that he never re-offends.

## III.  Monetary Penalties

Mr. Kuttke asks the Court not to impose the $5,000 special assessment

contemplated by 18 U.S.C. § 3014(a) and the special assessment under §2259A. Per

the plain language of the statute, § 3014 is not to be assessed on "indigent" persons.

18 U.S.C. § 3014(a). When considering whether an individual is indigent under, §

3014 courts look at an individual's current ability to pay and their future earning

potential. *United States v. McMiller*, 954 F.3d 670, 675 (4th Cir. 2020). Factors

relevant to a future earning potential may include financial resources and assets,

financial obligations, projected earnings, other possible sources of income, age,

education, health, dependents, and work history. *See id.* at 674.

Mr. Kuttke was deemed indigent when the Federal Public Defender's Office

was appointed to represent him.  His financial situation has worsened in the

interim and, as such, he will likely remain indigent for the foreseeable future.  The

mandatory minimum sentence ensures that he will not have a significant income for

five years.  Once released, he will have to transition back to the work force, in a

country where he has not worked for over a decade, even prior to his impending

incarceration, and with the stigma of a sex offender conviction.  He will also have,

at minimum, eighteen thousand dollars in restitution to pay toward the victims in

this case. Pursuant to § 3014(f), Mr. Kuttke must make his restitution obligation a

28

priority. This means that any possible excess future income will be needed for restitution payments.

Mr. Kuttke also asks that the Court not impose the special assessments contemplated by 18 U.S.C. § 2259A. That statute provides that the Court must consider the factors in 18 U.S.C. § 3553 and § 3572 when determining the amount of this assessment. See § 2259A(c). Here, the amount should be zero because, again, Mr. Kuttke has been deemed indigent, and he will most likely remain so. Further, imposing these assessments would only limit Mr. Kuttke's ability to pay restitution to the six identified victims in this case. *See United States v. Sanders*, No. 3:21CR-80-RGJ, 2022 WL 1493858, at *2 (W.D. Ky. May 11, 2022) (imposing no assessment pursuant to § 2259A due to finding that defendant will be unable to pay a fine or special assessment, and because "restitution is more important in this case than the imposition of a fine"); *United States v. Hyatt*, 572 F. Supp. 3d 576, 586 (N.D. Ind. 2021), overruled on other grounds, 28 F.4th 776 (7th Cir. 2022) (finding that imposition of an assessment pursuant to § 2259A would impair defendant's ability to pay restitution).

Allowing Mr. Kuttke to focus his limited financial resources on restitution is not a "break" – it is a realistic assessment of Mr. Kuttke's post-prison life. In addition to finding work, which will likely be difficult in his field, and navigating a return to his native land, Mr. Kuttke will be focused on expediently paying the restitution.

## <u>CONCLUSION</u>

For the reasons set forth above, Mr. Kuttke respectfully requests that the

Court impose a sentence of no more than 60 months of imprisonment followed by a

reasonable period of supervised release.

Respectfully submitted,
PETER MARKUS KUTTKE
By counsel

_____/s/_____
Brooke S. Rupert, 79729
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0849
Brooke_Rupert@fd.org
