FILED
MAILROOM
SEP 14 2026
CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**IN THE UNITED STATES DISTRICT COURT**
**Eastern District of Virginia**
Alexandria Division

United States of America

v.

Peter Markus Kuttke
Defendant

Case Numbers: 1:24-cr-245 (RDA)
1:25-cv-1986(RDA)

**RESPONSE TO UNITED STATES' MOTION TO STAY OR DISMISS PROCEEDINGS**

I, Peter Markus Kuttke, Reg.No. 46751-511, Federal Inmate at FCI Coleman Low, pro se, respectfully submit my response to the United States' MOTION TO STAY or DISMISS PROCEEDINGS in my filing for relief under 28 USC §2255, dated January 23, 2026.

I am aware that my response is likely outside of time limitations and that the Court made already its decision. I did not gain knowledge of the United States' Motion until I received the Courts Order, and about the details and arguments made until August 4, 2026, when I requested additional documents for my Direct Appeal.

Consequentially, as mandated by BoP Program Statement 1330.18, I entered the Administrative Relief process and filed an Informal Resolution Form on August 14, to inquire about the delivery and the whereabouts of the documents. On August 18, Counsellor Wade responded with an answer from the Mail Room, that more information, from the sender, was needed to determine if it was received at all at FCI Coleman Low [Attachment 1].

A possible delivery via the BoP Legal Mail Process, which requires enhanced documentation by staff and inmates, and which provides enhanced privacy, could be taken out of the picture prior. Counsellor Wade checked, the documentation in the Legal Mail Book did not contain any entries for the time period.

While I do not oppose the United States' Motion to Stay Proceedings, I do OPPOSE to the United States' MOTION TO DISMISS.

**HISTORY**

On January 8, 2025, I plead guilty to one count of receipt of child sexual abuse material in violation of 18 U.S.C. §2252(a)(2),(b)(1) (Dkt. 8) after a Grand Jury charged me with in November 2024 (Dkt. 1).

The charges are the result of an investigation conducted by Virginia State Police and Bedford County Sheriff's Department. I became a person of interest in these investigation approximately between fall of 2022 and spring of 2023. Department of Homeland Security's Homeland Security Investigations (HSI) eventually took on the case and brought forward the complaint in the Eastern District of Virginia.

The investigation in my case was triggered because over the course of several months, I identified multiple Peer-to-Peer swarms, using BitTorrent technology, distributing child sexual abuse material. I was trained and experienced to identify malicious actors in the Internet, because I worked in this field in the German Department of Defense for almost 20 years.

I documented the promoting website, geolocated the two only distributors to sites in Virginia, USA and identified the owners/subscribers of Internet services. I isolated and analyzed network traffic.

Data shows, that, at the time of my offense, the lifespan (duration) of the distribution of child sexual abuse material was approximately 6 years (2017-2023). The volume of shared data was multiple Terrabytes up to Petabytes (1,000,000,000,000 bytes - 1,000,000,000,000,000 bytes), which is equivalent to multiple hours of content. An estimated (based on samples) 70%-90% of the data are actual downloadable.

The data in my investigation, and the analysis thereof, shows, that, in fact, Virginia State Police and Bedford County Sheriff's Department were distributing child sexual abuse material for more than 6 years. Further, all the material on my devices originates from these two sources.

My investigation was triggered by an, in my opinion in form and stated claims, controversial speech by Alessandra Parisi-Serano in front of the Senate Judiciary Committee in the confirmation hearings of Supreme Court nominee Ketanji Brown Jackson, in conjunction with the provisions made,inter alia,in the CALEA and Adam Walsh Acts. Also, the international perspective I have and the efforts taken in other countries, the provisions in the Budapest Convention on Cybercrime allege that child sexual abuse material has to be deleted and that Law Enforcement has to be trusted in this, not that they extensively redistribute it.

Consequently, because I made no attempt to conceal my electronic identity or fingerprint, on December 1, 2023 HSI, Virginia State Police and Fairfax County Police conducted a search of my residence with 7 officers/agents. (Declaration of Agent Greene, Dkt.#26, Att.#1, at 2.). There was no reasonable expectation that no officer was armed, not ready to use deadly force, or not trained in the use of a firearm. One officer, guarding the interrogation cabin at a later point in time, was dressed in tactical gear and carried an assault rifle. A reasonable person would not have believed that I was under arrest.

When I asked for the reason of the search, the female officer of hispanic decent with Fairfax County Police, told me the "lead agent" would me inform about the reason in the mobile unit and not in my appartment.

At the time of the interrogation, I believed to be in double jeopardy, either as a person of interest, or as a skilled or expert witness against Virginia State Police and Bedford County Sheriff's Department because I knew and had evidence about the distribution of child sexual abuse material.

Agent Cook did not introduce himself as associated with Virginia State Police, rather to be from the Virginia Internet Crimes Against Children Program Taskforce, an organization I never heard of before. I believed that Agent Cook was an Federal Agent and that, in this office, he was aware about the source of distribution. I told him this at the beginning of the interrogation by saying "You already know everything.". At the end of the interview I stated: "I found the website [Virginia State Police's, Bedford County Sheriff's Department's] and I downloaded possibly russian content.", referring to pathnames as seen in the Government's Motion in Limine to Exclude and Limit Certain Arguments, Lines of Questioning, and Evidence at Trial (Dkt.#22, at C.4.: "Source: [...]").

After the interrogation, Agent Greene guided me back to my appartment. Forensic experts were waiting and called for Agent Greene with urgency and concern. I could overhear the words "He triaged us!" clearly at least two times. After a conversation between Agent Greene and the Forensic Experts of approximately 20-30min in the upper bedroom, the dynamics and atmosphere of changed. The female Fairfax County Police Officer remained the only chatty one.

The upper bedroom was the location where the network storage device was located.

On site, in the upper bedroom of my apartment, forensic experts examined multiple mobile storage devices (USB-Sticks), spare and decommissioned harddrives, 3 laptops, 1 mini computer, one network storage device and my mobile phone. They allegedly only visually inspected a device I used for research and training in Cybersecurity (Flipper Zero) and the hardware issued by the German Government, which was fully encrypted.

For further investigation, they took the laptops, the network storage device, the mini computer, the decommissioned harddrives, and my phone off-site to the HSI forensic lab.

All devices except the network storage device, the decommissioned harddrives, and one of the laptopts (Lenovo) were returned, almost one year later, at the day of my first appearance in court.

After the search, until the first appearance, I hired attorney Mark Petrovich of Fairfax to establish communication with the investigators and the prosecution, and to prevent further violations of constitutional rights and the law.

At the time of my first appearance in court I decided be represented with a Federal Public Defender, because in German court a litigation in child support was about to be settled amicably, but the seizure of my passport by HSI prevented my appearance in court. Being aware of my assets, I could not estimate the costs of a settlement and a now coming judgement. The claims were about to eat up the assets. An US defense attorney was not affordable.

Being presented with the charges in US criminal court, I knew the indictment and the investigation was wrong. The time of the offense was overly broad. While being familiar with Peer-to-Peer technology since its development around the year 2000, and the first release of BitTorrent as one improved implementation, I rarely used it to download data, which was often times contaminated with malware or other unwanted or illegal content.

Further, I did not possess any of the examined devices at the claimed beginning, nor was I in the country.

I immediately protested to AFPD on duty, but she told me to be taken care of the issue later in the process.

AUSA Parisi-Serano validated the Indictment by claiming that the software was installed in March of 2014 (Dkt.#9).

At my first meeting with assigned AFPD Rupert in her office outside the courthouse, I immediately stated that I did not engage in these downloads for child pornography, or to obtain child sexual abuse material, rather that it was because of the sources which distributed it. I emphasized that we (meaning the defense) need the devices to secure our own evidence. I explained that the crucial information can be found in the logdata and in the operational files, and that the child sexual abuse material important too, but not of that significance.

A special role played the network storage device. It contained publicly available subscriber data for certain Internet services (Domain registrations, IP-Address registrations), as well as publicly available tracking information for the data packets (traceroute, tracepath). These information contain subscriber name and location and were consistent. A screen recording tied these information to the only nodes in the BitTorrent swarms distributing child sexual abuse material, and the website distributing it as well its affiliation and integration in Google's services.
The network storage device contained also log data about denied and resource-limited communication from the network firewall I used to connect to the Internet.

I mentioned everything to Mrs. Rupert, she said shee needed approval for an forensic expert. In a later meeting she claimed, she got it approved.

This own evidence, I know exists, or the lack to produce it, played a material role in my decision to plea guilty, because it would have shown the role of Virginia State Police and Bedford County Sheriff's Department in facilitating and inducing my downloads. With my knowledge about BitTorrent, Internet technology in general, and how Parisi-Serano presented herself in the public, I had reason to believe,that the discovery by the Government would be tainted and biased.

At this time,I did not know about the legal framework and the procedural requirements necessary, to obtain the devices, namely Federal Rule of Criminal Proc.16(a)(1)(E),(F), and in this case because of the Government's special obligation to protect the victims of child sexual abuse, 18 U.S.C. §3509(m)(1),(2). As per docket, Mrs. Rupert made no attempt to Compel the Court to Order the Government to let the Defense Inspect the Evidence.(F.R.C.P 16(a)(1)(E)).

Already at the Arraignment, the court ordered the Government to produce Discovery (Dkt.#14). The document was eventually produced at a later point in time. There is no explicit reference to be found in the Docket, when the Discovery was presented, but possibly AUSA's NOTICE of Rule 16 Disclosure (Dkt.#23), well past the due time for pretrial motions.

Upon inspection of the Discovery, I told AFPD Rupert, that elements were missing or were misrepresented. I especially mentioned the network storage device, which was claimed to contain traces of certain productions of child sexual abuse material. I knew this was not true, rather that the network storage device contained the evidence about the distributors of the child sexual abuse material. I have also reason to believe that the number of media files found is significantly too high. Designated filespace and transmission time couldn't afford this. An as attachment mentioned filelist was never presented.

I reasoned and provided Mrs. Rupert ample probable cause to question the Government's facts and put them in a different context: the predisposition of Parisi-Serano to be influenced by conspiracy theories due to her involvement in O.U.R., a nonprofit designed to capitalize on the fight against child pornography, my observations about the police being the promoters and distributors of child pornography, my expert knowledge about BitTorrent, and the evidence to be found on the devices, not mentioned in the Discovery. She went forward with the Government's theory. I even mentioned that the whole process, from downloading CSAM, provided by police to conviction and sentensing is very slipstreamed.

From the statements I made during the interrogation in the mobile unit, Mrs Rupert showed only the part, where I said, that I downloaded it. The beginning of the interview, where I say, knowing where the material came from, that "they already knew everything", Agent Cook's two times' attempt to steer the conversation in a sexual ("[...] we all watch porn [...]") or masochistic ("[...] in my youth I liked to watch 'Thousand Faces of Death' [...]") direction, my assertions, that 'I found the website'(maintained by Virginia State Police and Bedford County Sheriff's Department),'which contained Russian content', kept unmentioned.

When Mrs. Rupert and I talked about if I should go to trial, she asserted, that I could be charged for every image and video separately, which played a huge factor for my plea of guilt.

**Procedural History**

In November of 2024, I was indicted pursuant an investigation by the Virginia Internet Crimes Against Children Program Taskforce. Leading Agents were Federal Agent Greene (HSI) and Virginia State Police Agent Cook.

On January 8, 2025, I plead guilty to 1 Count of Receipt on Child Pornography, based on Discovery presented by AUSA Parisi-Serano. The plea deal was 108-156 months in Federal Prison in case of a trial vs. not opposing to 60 months mandatory minimum requested by defense.

On April 09, 2025, I was sentenced to 78 months Federal Prison, 10 years probation, $9,000 Special Assessment, $18,500 Restitution to 6 identified victims, and reimbursement of the Federal Public Defender of $13,600.

On April 25, 2025, AFPD filed a Notice of Appeal against the reimbursement order.

On November 05,2025, Defendant Peter Markus Kuttke filed pro se a Motion to Vacate under 28. U.S.C. §2255.

On December 12, 2025, the court directed the Government to respond to Motion under 28 U.S.C. §2255.

On January 21, Defendant filed a Motion to Communicate via Postal Mail and Extension of Time due to unpredictable ways to receive Orders and Motions, and assure timeliness.

On January 28, Motion by USA to Dismiss or Stay Motion under 28 U.S.C. §2255.

On January 28, 2026, the court ordered the Motion under 28. U.S.C. §2255 to STAY Proceedings until the Appeal is adjudicated and resolved, and ordered that the Defendant's Motion to Communicate per Postal Mail and Extension of Time is Denied as Moot.

**Argument**

For a Motion 28 U.S.C. §2255 to survive in court, it is necessary to establish a claim on ineffective assistance of counsel. A petitioner must show that counsel's performance fell below an objective standard of reasonableness, and that he was prejudiced by such constitutionally deficient representation. Strickland v. Washington, 466 U.S. at 687-91 (1984). In measuring counsel's performance, there is a strong presumption that counsel's conduct was within the wide range of reasonable assistance. Id. at 689.

I can not and I do not attempt to challenge Mrs. Rupert's, defense counsel's competence, knowledge, and experience, yet I see constitutional violations and grounds for relief. I am an engineer, computer science expert, and a stranger in Mrs. Rupert's profession, therefore I struggle in proper legal reasoning. My struggle in focusing on one argument might be symptomatic for the complexity of the circumstances of my offense.

My personal legal framework stems from the Old-World, Roman-Law-influenced concepts of a neutral role of the Government and that Law Enforcement has to act lawful, especially when guarded by immunity. Certain tactics are futile from its beginnings. My believe in this paradigm played a crucial role in my offense.

Part of these Old-World framework is, that an accused has the right to be heard and to present exculpatory evidence. In U.S. law this principle is cemented as due process in the Constitution and codified in the Federal Rule of Criminal Procedure (F.R.C.P.) 16.

I knew that tangible evidence of exculpatory nature exists on the devices seized by the Virginia ICAC Program Taskforce. I knew that, because that was the point of my actions, to produce evidence: sensitized by Alessandra Parisi Serano's March 2022 at the Supreme Court confirmation hearings for Ketanji Brown Jackson, an the media fallout, I recognized a politicization and capitalization of the combat of child exploitation. From a European view, these crimes were effectively curbed, even though flare-ups existed due to lax policing by social media companies.

Sensitized, technically versed, somewhat aware of the socio-psychological effects in the Internet, an U.S.-based BitTorrent infrastructure caught my attention. Due to the strict laws in the U.S., it was at this point unlikely that it was used to exchange child exploitative material of any kind. My first investigation showed, that all participating servers were located in Virginia and associated with Virginia State Police.

In fact, the nature of the content was not recognizable at the time, only that Virginia State Police is interested in sharing large amounts of data since 2017.

Over the course of several months, I became aware that a large amount of the data could be, in fact child sexual abuse material and other depictions of child exploitation. Further, it became clear, that Bedford County Sheriff's Department were involved in the prolonged, extensive and unprotected distribution of CSAM.

Being vaguely aware of European and International efforts and results in the combat against child exploitation, the actions of Virginia State Police and Bedford County Sheriff's Department transcendented any of my concepts of policing, including undercover sting operations.

I separated CSAM associated data from log-, meta-, and operational data, not associated with CSAM, deleted CSAM, and retained non-CSAM. I expanded the evidence with professional tools, well known in Cybersecurity.

The evidence was conclusive, screenrecordings, logfiles, operational data, IP address- and Internet domain registrations tie it together to Virginia State Police and Bedford County Sheriff's Department as distributer of hundreds of thousands of media files distributing CSAM from 2017 till, then 2023.

Computer facilitated offenses heavily rely on data. Data is at the core of the offense. Every transaction leaves a trail of data and tells a narrative, ultimately leading to truth. The selective suppression of data leads to prejudice and a different version of truth. I could observe such a dramatic change during the search on December 1. and the aftermath thereof: at the interrogation, ICAC Program Agent Virginia State Police Special Officer Cook worked hard to establish a predisposition to watch pornography, sado-masochistic, and a curiosity for child pornography, based on the data trail on Virginia State Police's servers. After the interrogation, ICAC Program HSI Special Agent Greene harshly realized, that this predisposition was was in jeopardy and possibly no longer sustainable, because he learned from on-site forensic experts, that I collected data about Virginia State Police's and Bedford County Sheriff's Department unmitigated distribution of child pornography, seized previously. The dynamics during the search abruptly changed, no ICAC Agent spoke a word anymore.

Ultimately, the Government exclusively presented the part of data associated with CSAM most graphic and lasciviously for the indictment and as Discovery. The non-CSAM data, incriminating to ICAC Program Agencies, is not mentioned or described as 'traces of CSAM' which require a lengthy 'data-carving' investigation to undermine and block disclosure under F.R.C.P. 16(a)(1)(E). Additionally, the Government, AUSA Alessandra Parisi Serano expanded and overstated the time of the offense to 9 years to make sure to allege predisposition, propensity and habit for receipt and consummation of child pornography.

Knowing the exculpatory value of the non-CSAM data for me, I told AFPD Rupert, that we need the devices, or at least the non-CSAM data to show that my downloads were not motivated by a predisposition to receive CSAM, rather to disclose the distributors. Mrs. Rupert made affirmative statements, that she needed approval by her supervisor to retain forensic expert, later she confirmed that she received approval and contacted expert. I believed until the date of my sentencing, that Mrs. Rupert is in contact with expert and provided additional information for expert to document.

Whenever I noticed inconsistencies in the Government's documents, whenever I knew there was a different side to the truth, I immediately voiced it to Mrs. Rupert, yet her effectiveness seemed limited. In one meeting I told her, that I have the feeling, that the whole process, pre-offense, plea deal, until sentencing seems to be 'streamlined' with no voice for the defendant, which I believed to be a quirk of the U.S. American judicial system.

When Mrs. Rupert and I discussed my decision to go to trial, I still believed that our own forensic expert would be able to produce exculpatory evidence. At this time, I did not know that Mrs. Rupert did not file a motion to compel the court to order the Government to produce the seized non-CSAM data. She said, that the expert produced nothing. Further, she said that when going to trial, I could be charged for every single CSAM media file. United States v. Buczkowski, 458 F.App'x 311,317 (4th Cir. 2011) notes however, that the "central focus" of 18 U.S.C. §2252(a)(1)(A), which criminalizes the transportation of child pornography, "is the act of transporting, not the number of individual images transported". This case law is referenced in other cases as test for multiplicity. It is reasonable to believe, that Mrs. Rupert was familiar with the principle and also with the psychological effect of multiple charges on the defendant. For me there is no indication, that other principles should apply.

**Conclusion**

In 2022, I believed, that Alessandra Parisi Serano's claims in her speech in front of Senate, regarding child-exploitation, belonged well into the foundational realm of conspiracy theories of QAnon. I learned later, that my perception was shared by Kaitlyn Tiffany, a staff writer for The Atlantic in her article "The QAnon Dog Whistle at the SCOTUS Confirmation Hearings, Republicans invited a lawyer from QAnon's favorite nonprofit to weigh in on Ketanji Brown Jackson". I low-key and low-effort felt the need to debunk these claims, with no priority at all.

What I discovered was outside my ethical and moral frameworks and well above my paygrade. The initial contact, I believe, was circumstantial, referred by Google. Virginia State Police and Bedford County Sheriff's Department created and operated a BitTorrent infrastructure, to share large amounts of data. Later I realized that the purpose of this computer system was to distribute depictions of child-exploitation, child sexual abuse material (CSAM), and I learned that these two agencies are founding members of the Internet Crimes Against Children Task Force Program mandated by Senate under 34 U.S.C. §211. I believed what I saw was way outside of any sting operations. Promotion, accessibility, duration of availability and amount were designed to create and sustain a market for this kind of material.

I learned that, by distributing CSAM, the Virginia ICAC Program Task Force <u>violated their own bylaws</u> "Internet Crimes Against Children Task Force Program - Operational and Investigative Standards" (ICAC Standards manual) as mandated by 34 U.S.C. §21114: 'Each State or local ICAC task force that is part of the national program of task forces shall-(7) establish or adopt investigative and prosecution standards, consistent with established norms, to which such task force shall comply;(10) seek to comply with national standards regarding the investigation and prosecution of Internet Crimes against children, as set forth by the Attorney General, to the extend such standards are consistent with the law of the State where each task force is located."

The following sections of the ICAC Standards manual apply:

8.1 Investigations shall be conducted in a manner consistent with applicable laws and constitutional requirements

8.4 Members shall not electronically upload, transmit, or forward any Images.

13.5 Law Enforcement Officers when setting up an online Internet undercover sting operation are mandated to ask permission in writing via a Cooperative

Agreement to said Social Media/Social Networking Application's/**Website**'s Legal Counsel/Legal Team for the express purpose of conducting said online Internet undercover sting operation. Law Enforcement Officers shall not violate and are prohibited from violating the Terms and Conditions of the Online User Service Agreement of any and all adults-only-oriented Applications/**Websites** because then they would be in violation of title 18 U.S.C. §1030, the Federal Computer Fraud and Abuse Act.

13.6 If Law Enforcement Officers violate and do not honor the Liability Clause of the Internet Crimes Against Children Task Force Memorandum of Understanding and violate and do not honor the Oversight Clause of the Internet Crimes Against Children Task Force Operational and Investigative Standards, then they would be in violation of title 18 U.S.C. §1961-1968, the Racketeer Influenced and Corrupt Organizations Act.

13.7 Law Enforcement Officers are prohibited and shall not commit Egregious-Outrageous Conduct, Entrapment, by Cajoling, Compelling, Convincing, Enticing, Inducing, Luring, Persuading, Seducing, Tempting a person who is not predisposed to commit the crime nor premeditating to commit the crime, and if not complied with, would be in violation of title 18 U.S.C. §373, the Solicitation to Commit a Crime of Violence Act and in violation of title 18 U.S.C. §2422, the Coercion and Enticement Act, and in violation of the Federal Elements of Entrapment from the United States Department of Justice Archive's Manual Criminal Resource Manual, section §645.

I learned that, by distributing CSAM, the Virginia ICAC Program Task Force violated national law. Inter alia the following titles apply:

18. U.S.C. **§3509(m)(1)**, Adam Walsh Child Protection and Safety Act of 2006: "In any criminal proceeding, any property or material that constitutes child pornography (as defined by section §2256 of this title) shall remain in the care, custody, and control of either the Government or the court."

18 U.S.C. **§2252A**: Certain activities relating to material constituting or containing child pornography

18 U.S.C. **§2252B**: Misleading domain names on the Internet

18 U.S.C. **§2252C**: Misleading words or digital images on the Internet

47 U.S.C. **§223a** (as carrier): Notice and removal of nonconsensual intimate visual depictions

47 U.S.C. **§231** (as carrier): Restriction to access by minors to materials commercially distributed by means of World Wide Web that are harmful to children

I learned that, by distributing CSAM, the Virginia ICAC Program Task Force violated International treaties. U.S. Senate ratified in 2006 the 2001 Council of Europe Convention on Cybercrime (https://rm.coe.int/1680081561, [Explanatory Report] https://rm.coe.int/16800cce5b). Section §9 applies to child exploitation. 47 countries are signatories and adopted the provisions in national law. There is a common consensus in the combat against CSAM, that it has to be deleted from the Internet.

It is not unreasonable to believe, that the Virginia ICAC Program Task Force intentionally maintains and revitalizes a market for CSAM.

I learned that the ICAC Program Task Forces are under tremendous sucess-pressure (34 U.S.C. §21111, §21112(b)(2),(3)(A);§21113(4)-(7)), competition (§21111(c)(4)-(6)), and highly technisized (§21115). They are monetary incentivized (§21116) to maximize the number of leads (§21116(a)(2)(B)(ii)(II)-(VI)), proactively (§21113(2),§21114(4)), and increase the number of investigations and prosecutions (§21113(4)). The ICAC Task Force Program monitors the judicial system (§21111(c)(4)(A),(6)(D)) and gives feedback to legislature (§21111(c)(3)(C)). Newly, members of the ICAC Task Forces were equipped with enhanced immunity (§21112(c)).

These kind of provisions require a high level of oversight of the ICAC Task Forces by the DoJ. The violations of the ICAC Standards manual, national law, and International law leave reason to believe, that this oversight was not effective, which led automated Internet services, presumably worldwide, index the child exploitative material.

That the Law Enforcement Officers at the search of my residence were aware of their violation, was shown in their reaction after they discovered that I retained data about Virginia State Police's and Bedford County Sheriff's Department's role and contribution in the distribution of CSAM, and my potential to disclose. This data, Brady material, software tools, configurations, work products, was not part of the forensic Discovery by HSI Computer Forensic Expert Ryan McCollum, therefore preemptively suppressed, most incriminating parts were mislabeled and misrepresented.

AUSA Alessandra Parisi Serano, now prosecutor in my case, knowingly used the effect of time and graphic language in child pornography cases on jurors of a grand jury to ensure the return of an indictment. In fact, none of the devices used in the offense was in my possession before March of 2023. AFPD Rupert was aware of this fact.

AFPD Brooke Rupert was unable to conceptually exculpatory Brady material (non-CSAM), subject to F.R.C.P. 16(a)(1)(E), from Adam Walsh material (CSAM), subject to 18 U.S.C. §3509(m)(1). Despite my explicit wish for examination of the data in possession of the Government, by own Computer Forensic Expert, AFPD Rupert took no action to receive the data, or get access to it. This omission is of constitutional concern, because it violated due process, the right to be heard. I knew due to my professional training, experience, and findings, that the Brady material (non-CSAM) is tangible evidence to reflect most accurately my role in the offense to disclose, that Adam Walsh material (CSAM) was massively (amount) and extensively (time) used by the Virginia ICAC Program Task Force as bait in a premeditated setting. The inspection of the Adam Walsh material (CSAM), would have shown, that, in fact, the majority of the stated material possibly was not even received, because I manually stopped the downloads. Conclusive data would have been found in the Brady material (non-CSAM) and is in fact depicted in screenshots in the Discovery.

AFPD Rupert in preparation for trial possibly took the lest effective route to mitigate punishment, she motioned for a Bill of Particulars, possibly the lest objective source for information, with basic provisions (Dkt.21). Promptly, of course, she was opposed by AUSA Parisi Serano (Dkt. 25). Details of the opposition are, however, not known to me.

AFPD Rupert's second Motion to Suppress Statements (Dkt.20) has to be seen in context with the availability of Brady material (non-CSAM) for defense. With Brady material available, the statements at the interrogation would indicate that I exactly knew and identified Virginia State Police as distributor of CSAM and that ICAC Agent Special Officer Cook tried compel statements of sexual preference for minors and sado- masochistic ideology from me. Further I stated, that I found their [Virginia State Police's] website with Russian content.

Without Brady material, Mrs. Rupert's Motion makes sense, because no reasonable person believes that he is not under arrest, when at 6am 7 armed officers, 1 in tactical gear, knock and search. Fairfax Police Officer told me that the Leading Agent tells me the reason for the search only in the mobile unit, after I twice inquired the reason for the search.

AFPD Rupert'c counsel however, rather to plea guilty than to go to trial because I could be charged for every media identified as CSAM is only reasonable in the light of an attempt to influence me to abandon my attempts to be heard.

It is reasonable to believe, that but for the omission of Mrs. Rupert to compel the court to order the Government to produce Brady material the outcome of a trial would be different, in fact it would be possible to raise Entrapment claims and Egregious Outrageous Conduct by Police, members of the ICAC Program Taskforce. Established frameworks might have been adapted to new acts in Cyberspace. The actions of the Virginia ICAC Program Taskforce was more than providing the chance to commit a crime, especially because the Internet is inherently of a self-service nature. Rogue actors use exactly the same principles as the ICAC Program Task Force to gain unauthorized access to data or commit fraud.

If Mrs. Rupert communicated more openly and upfront, that she does not intend to use the provisions of F.R.C.P. 16(a)(1)(E), I would have more insisted on it. In fact I felt in limbo until sentencing.

It is reasonable to believe, that Mrs. Parisi Serano in her 2022 speech, prepared the ground and gave the directions for things to come.
Virginia State Police and Bedford County Sheriff's Department delivered. They designed and premeditated a crime. Cloudflare, Google, DuckDuckGo, and Social Media became witting or unwitting helpers. Their algorithms ensured sufficient reach. BitTorrent, or Peer-to-Peer technology in general, became the means of choice, because it alleges secrecy and anonymity. In fact BitTorrent does not provide secrecy nor anonymity. That is exactly how I was able to identify the distributors.

The narrative, which certainly bears truth, of the Internet as a meltingpot of sex offenders with interest in children manifests certainly an environment financial beneficial for ICAC Program members and non-profits like O.U.R.

CSAM is still a multi-million Dollar business.

I told Mrs Rupert from the beginning, that I was not interested in CSAM, rather why U.S. Law Enforcement is distributing and maintaining a market.

For the reasons stated above, I respectfully ask the court to **vacate the sentence.**

Respectfully submitted,

Date: September 9, 2026

Peter Markus Kuttke
Reg.No.:46751-511
FCI Coleman Low

**CERTIFICATE OF SERVICE**

I, Ptere Markus Kuttke, hereby declare under penalty of perjury (28 U.S.C. §1746) that a true and correct copy of the foregoing documents were placed in the prison mail system on this 09 day of Sept., 2026. Copies have been mailed to the Clerk of the Court for the Eastern District of Virginia, Alexandria Division, 401 Courthouse Square , Alexandria, 22314.

I, respectfully request the Clerk of Court notify any and all other interested parties via the CM/ECF system.

Date: September 09, 2026

Prison Mail Box Rule:
**Houston v. Lack,** 487 U.S. 266 (1988)

Peter Markus Kuttke
Reg.No.: 46751-511
FCC Coleman Low
P.O. Box 1031
Coleman, FL 33521